Good morning, Mr. Wimmer. I'm assuming you are on 15 minutes, is that correct? Yes, please. Did you want to reserve time for rebuttal? Yes, please. Two minutes. How many? Two minutes, if you could, please. Great. Okay, Mr. Spalberg, how are you today? I'm wonderful. Thank you, Your Honor. Good morning. Assistant State's Attorney Alan Spalberg, representing the people of the state of Illinois. Okay. And you are on 15 minutes? Please. All righty. Mr. Wimmer, you can proceed. Thank you. May it please the Court? The Court is adjourned. This Court should reverse Mr. Barnes' conviction for armed violence predicated on mob action because the State did not prove beyond a reasonable doubt that Mr. Barnes was acting together with the person who shot at him within the meaning of the mob action statute. In this usage and this Court's precedent establish that acting together within the meaning of the statute requires acting according to an agreement or with a shared intent or a common purpose basically identical to that which would make one criminally accountable for another person's actions. Did the Court say something like that, Mr. Wimmer? Did some other Court say something like what you're just saying? Well, this Court's second district in People v. Kent, 2016, and before that, People v. Zafla in 2012, both of them were discussed in the briefs. And it's also clear just as sort of basic matter of English usage and the structure of the statute itself. When we talk about people acting together as opposed to things generally, and particularly when we talk about people acting together in a mob, we're talking about people acting with some sort of common goal or purpose to loot a building or buildings, to find somebody and inflict vigilante justice on them. And that's also a fact. What if they did agree to fight? There are cross-purposes, but they agreed to fight at cross-purposes. Hamilton and Burr. Yes. Would Hamilton and Burr have been guilty of acting together? Yes. That's absolutely the case. I mean, the problem here, for purposes of the State's case, is that they didn't offer evidence from which a reasonable fact finder could conclude that there was such an agreement, to be under reasonable doubt in this case. Generally, when people shoot at each other or fight, they're at cross-purposes. They're each attempting to harm the other person and not be harmed themselves. Wouldn't that be true in a duel as well? They're at cross-purposes. They're attempting to shoot each other. True, but it's specifically limited by the fact that each side has agreed to basically have a fair fight. Specifically, you have to agree to aid the other person up to a set point. There's rules. Classically, in a duel, you have to have so many paces, you turn around at a specific point. They choose weapons. No, go ahead, please. They choose weapons, don't they? Classically, yes. One person chooses weapons, the other can choose a location. I don't have all the classic rules in front of me. We can have rules here. We don't have to, right? It doesn't have to be a formal duel. It can be an agreement. If on a previous occasion, the unidentified man or Bivens had said to the defendant, they had words and they said, you know, I'll see you at Gus's restaurant at 8 o'clock on whatever night. And they both met there. Would that be an agreement to fight? It would depend on the context, but yeah, it sounds like it. I mean, actually, I didn't think of this when I was writing the briefs, but what that sounds like is a classic planned rumble among 50s New York fighting gangs, which apparently actually happened. I checked this out. It's not just West Side Story. Yeah, it did. And there actually are some cases that there were planned rumbles in that sense. I don't think we've ever had an argument with Westerns and West Side Story. I do. This is unique. It definitely is unusual, but the evidence in this case is not, you know, as strange as it would be required to actually back up some of these legal theories and references. Well, can I interrupt you? Yes. The State's position is obviously that it does not agree with your interpretation of the statute. As I read the State's brief, they're saying, I think, that willful participation is enough. Why isn't that enough? Why isn't participating in the gunfight enough to be acting together? Participating in a gunfight is not enough in that just acting together with another person, as it's put in, there was some language in Kent specifically, if you want to convict a person of mob action, there has to be some intent to commit an unlawful act. If just participating in a gunfight inherently violates the law, you're basically writing the justification of use of force in self-defense or defense of another completely out of the statute. It also says without authority of law, so that takes care of your self-defense situation. Why isn't participating enough? I'm not sure that without authority of law would capture acting in self-defense. More basically, you're creating additional problems. First of all, it's just contrary to the ordinary usage of acting together in English when referring to people acting together, in particular mobs acting together, and the legislature is presumed to use the ordinary meaning of the statute. In addition to that, there are constitutional due process issues that arise in that you'd be criminalizing a person's actions based on the actions of another person to which this first person didn't cause or consent to and had a legal right to respond to in a case where somebody's acting against them first. In light of that sort of English usage, the standard canons of construction, and the decisions already made by the Second District interpreting the statute, this Court should follow the Second District's interpretation. But we're not bound by it. You're not bound by it, no, but you should follow it. What about the situation where you have a sudden situation where, you know, there's a horrific event that occurs and all of a sudden a number of people begin, like, looting and moving into a store, and they actually have no connection at all with each other? Yes. And really, I mean, let's say that they don't even know each other. Under the statute, would they be guilty of mob action? Yeah. Well, at the very least, you'd have an extremely strong circumstantial case for mob action, and it's similar to sort of circumstantial cases that arise for accountability. There's plenty of cases out there where a group of people simultaneously, say, attack someone in some sort of street ball, and there's no direct evidence as to sort of prior communication between them, that sort of thing. You just can infer from the fact that, you know, they're all attacking the same person at the same time that, you know, there's implicitly agreement. In the looting, you know, kind of robbing things out of a store, breaking windows, I mean, I think it could be argued that at some point they are acting together. Yes. If they were all in there grabbing the stuff, whether they knew each other in advance or had any agreement, you could see that maybe they were acting together in that kind of looting situation. Yes. What distinguishes the current case from cases like that is the fact that there's a reason why a person in Mr. Barnes' situation would, you know, participate in a gunfight in this case, other than the fact that, you know, he agreed to be shot at. In the case of looting, or to take another example from the state's argument to trial, in the case of a, you know, sort of impromptu drag race from a stoplight, if a person declines to participate in that, if you stay in there and don't, you know, smash windows in a store, don't peel away from the stoplight, nothing happens to you. There's no downside risk to you of doing that. By contrast, if a person comes up to you, takes out a gun, points it at you, and you do nothing, there's a significant chance that something absolutely terrible is going to happen to you. Because of that, if a person responds to having a gun pointed at him by taking a gun out and, you know, responding in kind, you can't assume, it's not reasonable to assume, beyond a reasonable doubt, or I think even to a less generous standard, that the person has agreed to have a gun pointed at him in the first place or to be shot. He's responding rationally to an act, whether or not he would consent to it. And in general, you know, as reflected in this court's Peterson decision in 1995, it's contrary to human experience that people would invite being, you know, the victim of violence. In general, people do not do that. And the evidence in this case doesn't offer enough of a circumstantial case for a reasonable jury to conclude beyond a reasonable doubt that this case is anything unlike Peterson, that Mr. Barnes and the unidentified man were acting with anything other than the most common motivations, protect themselves, not be in danger. Let's talk about the agreement to fight. You admit that you're at cross purposes, but you're agreeing to fight at cross purposes. Hamilton versus Orville. Okay, yeah. But obviously we don't see a lot of duels these days. But we do see occasionally people agreeing to fight, I would imagine. You know, you think of two kids saying, I'll meet you behind the bike racks after school and we're going to fight. Like, that would be an agreement to fight, right? Yes. Well, where do we draw the line? I mean, what if two kids who should know better but unfortunately don't are walking down the street and one of them just instigates by maybe a push? You know, he says, okay, and he comes back and he punches him. I mean, do they agree? At some point did that form, did that blossom from an impromptu meeting to an agreement? What do you need? If agreement is the standard, what do we need to see just to prove the agreement? Short of a letter. Yeah, yeah, yeah. Ultimately, what would be required for an agreement to fight would be some sort of way for a person to decline and to participate in a combat other than simply running away full tilt or, you know, subduing the other person in some way. If you're talking about, you know, a sort of spontaneous fight, let's, it catches a bit more, let's move to a bar. You know, two people start shoving each other in a bar. Even if that occurs during the middle of some sort of verbal altercation, it's not an agreement to fight at that point. Somebody's fighting, another person is fighting back. If the fight stops for a moment and one says to the other, do you want to step outside? That's enough. All that's required is a situation with that person to say, you know, no, I don't want to step outside. You weren't worth it. You know, the guy can call him a coward, but whatever. At that point, you know, the fight is over. There's a way for this person not to become involved, you know, other than just running away or, you know, fighting back regardless. More generally, you know, I mean, there are cases that are potentially going to be difficult based on, you know, circumstantial, you know, circumstantial evidence. Ultimately, some of them are going to be going to a jury. This is not such a case that should be going to a jury. There's nothing here from which a person could conclude that there is any sort of opportunity to decline to participate in this, other than just fleeing or, you know, defending yourself. In addition, in the alternative, defense counsel performed unreasonably in this case in failing to have the jury instruct to this effect that acting together required an agreement or common purpose and effectively letting the state argue to the jury in closing argument that no such agreement was required. The simplest way for a defense counsel to effectively do that in this case would have been to submit a self-defense issues instruction with respect to mob action. It doesn't completely capture the law, but it does capture the sense that in that if Mr. Spaulding had not invited actions from the man in black shorts, he was not guilty of the charged crime. And if the jury had been so instructed, there is at least a reasonable probability that the jury would have acquitted him in this case. And so unless the Court has any further questions at this point, I deserve to remove my tongue for a minute. Thank you, Mr. Spaulding. Mr. Spaulding. Good morning, Your Honor. Good morning again. I agree with counsel in the sense that this is a unique case. The facts are unique. But that doesn't mean that the evidence failed to support the conviction for armed violence. It's pretty unique. Mob action predicated. Without a doubt. How often are they doing this now? Your Honor, admittedly, I've never seen a case like this before, but I've also never seen such a case. I hope you don't get a whole slew of them now. Come on. Mob action on this? They could have charged him with anything. And they drop all the charges except the mob action? No, Your Honor, no. We did proceed on the felony murder as well. And the jury acquitted the defendant of felony murder. Yeah, but he still got a sentence worthy of murder, didn't he? Not that we have any sentencing issue in front of us, but he got 24 years on in armed violence. And I believe the minimum sentence based upon the jury's finding was 20 years. And the judge exercised his discretion as to impose the appropriate sentence. The minimum was because of the weapon? Yes. Yeah. But admittedly, the facts are unique. But the uniqueness of those facts don't establish the legal claim that the defendant is raising here. No, but do you have any mob action cases? The offense has been around for a while now. Do you have any mob action cases you actually cited in your brief that would even in any way resemble this fact pattern? And I mean where you don't have any sort of discussion or agreement or statements about, you know, let's do it. No, Your Honor, we don't cite any particular cases like that in our brief. And I'm not aware of any either. But the language of the statute refers to the participants acting together. So under the state's interpretation of this, it's basically anytime there's a shootout, we're charging everybody with mob action? No, Your Honor. And filing murder based on that mob action? No, Your Honor, that's not what happened. But the facts of this case. Why isn't that? Because, again, it's the precise facts of this case. It's explained in the opening statement. It's explained in the closing argument. What the facts indicated were that the defendant in this case, after seeing Mr. Bivens and the other unidentified man, and the unidentified man flashed what seemed to be a gun, the defendant went to his car and then walked, grabbed his gun, and walked to the middle of the street as if this were a shootout in the O.K. Courthouse. Where's our agreement? Here's our pacing. Here's our we're going to turn. Where's the agreement that then we're going to shoot at each other? I'm not seeing any agreement. And admittedly, there is no express agreement, but I don't believe the statute requires an express agreement because it's not the same as the accountability statute. Accountability requires an implicit implied agreement. But instead, what we have here is willful participation in this, quote, unquote, duel, the shootout as it is, that they were willfully participating, and they could only participate if there were two of them. Let me go back to my question. What is preventing the state from charging anybody with this crime anytime there's a shootout? Your Honor, because I believe what we typically have, as I'm sure everyone here is aware of, is that most shootouts begin with one person shooting another and the other person shooting back. We don't have the setting up as occurred in this case. That's what is truly unique in this matter, is the defendant literally standing in the middle of the street ready to begin the shootout. I've never seen a fact pattern like that before, and that's why it amounts to a mad action. And I would ask just for a moment of your imagination. So if we're going to interpret this and we're going to write an opinion saying here's what acting together means, it's not just willfully participating. It's not every shootout. It's only a shootout where, what, fill in that sentence for me. Willfully participating in an action with another where they're acting together that places the broader community at risk. How is that not every shootout? How is that not every fist fight? Because in the typical, well, the fist fight is actually what I was about to use as an example, Your Honor. If instead of this being a shootout, if instead it was the defendant and the other unnamed individual meeting in the middle of the street, engaging in a bare knuckle ball right there, that would be them acting together, right? Because they could not be fighting without acting together. And the fact that they're cross purposes doesn't mean that it's not a crime because that would amount to oftentimes mutual combat that could result in, say, a second degree murder conviction in that regard. But not if he's charged with felony murder predicated on live action. Then you don't have to do the split the baby, do you? You go right to your felony murder sentence. That could be possible, yes, Your Honor. And admittedly, as I said, I've never seen a case like this. I don't know of any charges that were made like this in the past, but that doesn't mean that it wasn't proper here. So because the fact that they're cross purposes, even if they're fighting, doesn't defeat the nature of the willful participation of acting together. They can act together even if they can't be accountable for one another. And that's what was argued here. I don't really necessarily agree with the notion that acting together equals accountability. But at the same time, I think that your opponent is taking the words in their generally thought of explanation of acting together. It wouldn't include people shooting against each other where their lives are at stake. I really don't see that. So skipping the accountability equation, meaning acting together, that doesn't make any difference to me. But just generally speaking, acting together, you know, when somebody is pointing a gun at you and you're going to respond, I don't see that generally understood to mean those two people were acting together. Your Honor, in this case, however, the unknown individual, the unnamed individual, did not point a gun at the defendant. He flashed a gun underneath his shirt or something, but he did not point the gun. The defendant was the one who then went and got his gun and stood in the middle of the street. And that's what is different. That's why this is like a shootout where they both willfully entered and participated. It is more akin, if it were a fistfight, to the mutual combat scenario. So if we say this case is acting together and then tomorrow we get another case where there's a drive-by, one guy reaches out of a car window and shoots someone on the street. After being shot, he pulls out the gun and shoots back. We'll say, oh, that's different than people versus Barnes. Yes. Because in that case it was spontaneous. No, in that case it was spontaneous because in that case the second participant is acting in self-defense, is very clearly acting in self-defense. They were not willfully or mutually entering into the combat together in that regard. And so what's important to remember also is that all of these points were made to the jury. All of these factual allegations, all of the discussions. They weren't even told when acting together or not. Wasn't that sort of like noticeably absent for whatever reason? I don't know who was the defense attorney here. But, Your Honor, what counsel doesn't offer is what a non-IPA instruction would look like. What he seemingly is suggesting is that it would look very much like the accountability instruction or the self-defense instruction, which the jury was given. The jury was given the self-defense instruction. So not a mob action, it wasn't. It was a general self-defense instruction. And as you pointed out, Your Honor, the mob action requires that they act without authority. Without authority clearly means not justified. I mean, that's how I've always understood it to mean. But the jury was told very clearly, the defense attorney argued extensively, how could he be acting together? There are cross-purposes. And the jury instead decided as their trial effect that instead they were acting together, that there was a willful participation here. So the jury was told by the State that all they had to show was a participation in the fight. That's what the prosecutor kept telling the jury. The jury told them that there was a common course of unity of purpose. It just requires that they both participate. Yes, Your Honor. Is that a correct statement of the law? I believe it is because the common course, the joint purposes, the agreement, those are all rules of accountability. And no court, neither the Slapplech Court, excuse me if I can't pronounce it, or the Kent Court has ever said that acting together under the mob action is the equivalent of accountability. The Kent case instead identified the fact that the defendant in that case, the woman, was not doing anything. She wasn't acting at all. And that there was no evidence at all showing that she was a participant in what the other individual was doing when he hit him with the chair. And the Slapplech case, same thing. There was a finding that the defendant was accountable for the aggravated battery and then noted, well, because he was accountable necessarily, he was acting together. And what I think the significance of those cases are is that accountability is a greater standard. It is a higher point of commonality between the defendant and the co-defendant, between the defendant and the accomplices. But the mob actions don't require that for the same reason that the looting example works, that you can be engaged in a mob action with others who you don't even know. So you can't have that express agreement or that. Instead, we look to their conduct. Are they acting together? And in this case, there could be no shootout without the other individual. They had to act together to have the shootout. Sure, but in the store scenario I gave you, who's the victim in that case? Are any of those people going in, trying to loot and take things, acting? Who's the actual victim there? Well, the victim in that case would be the store owner, Your Honor. But the fact that we have an innocent bystander as the victim here is not really pertinent to the question of whether or not they were acting together, the defendant and the unnamed individual. We have to look at the defendant's conduct and the other person's conduct to see if they were acting together. Whether they were cross-purposes, whether they were fighting with each other, they were still acting together because if, but for their doing that, there would be no danger, there would be no mob action. In terms of the claim of ineffective assistance, as I stated, counsel doesn't offer whether or not an IPI instruction would look like that. We don't have an IPI instruction defining acting together. It's never been defined in the case law. And so to assume that an attorney is ineffective for failing to offer an instruction that doesn't exist, based on case law that doesn't exist, would really be a gigantic leap of this Court. And then finally, again, I would just stress that given the fact that this is a claim of insufficient evidence, this Court has to look at the evidence in the light most favorable to the prosecution. Counsel? Mm-hmm. I'm sorry to interrupt you, but what if the defendant had not fired his gun? What if he walked down the middle of the street but didn't shoot? Would he participate? And the bystander was shot by the other person. Yeah, everything else happened the same, but he just never fired back. Would he have willfully participated? I would say probably not, Your Honor, no. When did his participation begin? When he pulled out his gun and started shooting. No, no, no, those are two different things. Those are two different things. You just said if he didn't shoot, he didn't participate. Yes. So he goes into his car. Mm-hmm. Okay, the passenger side. He pulls out his gun, goes around. You would have him going more to the middle of the street. Yes. Mr. Wimmer would have him staying closer to the car, but whatever. He goes to the other side, and he's got his gun down. I'm not aware of any evidence that he has his gun down. No, no, no. Has he participated yet? No. Okay, so he starts participating when he shoots. Yes. If I could clarify one second. Of course you can. In terms of our ability to charge, whether we think probable cause would establish the crime mob action or whether we have sufficient evidence to prove the unreasonable doubt, I would say no, we would not charge it based upon him standing there, even with his gun down. It's when he raises his gun and starts shooting is where the mob action, at his level of participation, is. Okay, but he raised his gun and started shooting after he was shot at, right? I believe the testimony was almost simultaneously. I don't believe it was. Who said that? I think it was the victim's cousin. I could be wrong. I thought Mr. Young said that the shots came from farther away. He was close to the defendant, Young was, and he said the shots came from farther away. The defendant said that, and Henry, I think, they just were trying to get the heck out of him. But I thought he said that they were practically simultaneously. I could be wrong. I don't recollect that at all. But in a way, I do remember that I believe it was Mr. Henry saying that the entire event occurred in only about 15 seconds, which in my mind, Your Honor, would be practically simultaneously. Especially given the number of bullets that were fired on both ends. I believe there were nine bullets fired by the unnamed individual and six bullets fired by the defendant. And there's no question that the defendant fired those bullets because the gun was recovered from his brother. So I'm not sure where the precise point would be, but we do know from a matter of fact that the defendant did engage in a voluntary shootout with the other person. And that once we know that has occurred, that's where the mob action has happened. And so for those reasons, and particularly in light of the standard review, we would ask the court to affirm the defendant's conviction and sentence. Thank you. Thank you.  Thank you, Your Honor. Briefly, I want to respond to counsel's suggestion that a reasonable fact finder could in essence say that Mr. Barnes going to his car and taking the gun and then basically remained in the street was in some way setting up a gunfight. This runs straight into the problem that was noticed earlier, which is that if he doesn't perform these actions, he's at potentially a great risk of harm. And consequently, it's not reasonable to assume that he's agreed to be shot at merely by the fact that he's performing them. When the person in black shorts is coming up the street and shows a gun, at that point it's not reasonable for him to open fire. There's no obvious imminent likelihood of violence at that point. He knows it may occur in short order, so he arms himself. And as for him remaining in the street, again, well, not again, it just hasn't been mentioned yet at this point, but he has no legal obligation to leave. There is no, even if at that point he reasonably did know that the man in black shorts was eventually going to shoot at him, he was under no legal obligation to flee or leave the street under Illinois law. Finally, I haven't looked at this, but I'd really like to look at it, but I'd always read the without legal authority thing as sort of indicating that you weren't a police officer or otherwise an officer of the state. But to be fair, I hadn't specifically researched it. At any rate, with regard to the issue of whether or not the jury received an instruction on self-defense with regard to the mob action charge, the state specifically argued in closing argument that it didn't apply as a matter of law. And the court specifically agreed with that, overruling defense counsel's objection to the argument. There's no reason in this case to think the jury thought that self-defense was an issue with regard to the mob action instructions and consequently with regard to the nonviolence charge. And for that reason, if it had been so instructed, there's at least a reasonable probability that it would have acquitted him, Mr. Lawrence, that had received those instructions. So unless there are any further questions, just urge the court to reverse the conviction. Thank you. Thank you. The court will take the case under advisement, and I believe we are adjourned. Thank you.